**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Orville DUNAVAN, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Edward MITCHELL, Defendant-Appellant.**

**Nos. 71–1378, 1379.**

United States Court of Appeals,
Sixth Circuit.

July 21, 1972.

McAllister, Senior Circuit Judge, dissented and filed opinion.

Dale Quillen, Nashville, Tenn., for appellants.

Ira E. Parker, III, Asst. U. S. Atty. (Charles H. Anderson, U. S. Atty., Nashville, Tenn., on the brief), for appellee.

Before WEICK and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

ORDER

Upon consideration of the important Fourth Amendment issues involved in the above-styled appeal; and

Noting the uncertainty in the record in relation to critical facts referred to below,

The case is remanded to the District Court for such additional hearing and findings as may be required to answer the following question:

Whether the police knew that Dunavan had recovered consciousness and been released from the hospital 1) when they entered his motel room, and 2) when they opened the first brief case?

Entered by order of the Court

/s/ JAMES A. HIGGINS
Clerk

McALLISTER, Senior Circuit Judge (dissenting).

From the views of my colleagues that the case should be remanded for findings of fact, I cheerfully dissent, being of the opinion that certain evidence upon which the conviction was based should have been suppressed because of an unlawful search and seizure, and that the case should have gone to the jury on the evidence of eye-witness testimony, of films taken by hidden cameras during the reopening of the bank, and on the other evidence offered by the prosecution.

The facts are as follows: Appellants were tried and convicted of robbing, by force and intimidation, a federally-insured bank in Nashville, Tennessee, in violation of Title 18 U.S.C.A., Section 2113(d). They were sentenced to twelve years of imprisonment under the provisions of Title 18 U.S.C.A., Section 4208 (a) (2), under which the Board of Parole may determine eligibility for parole.

They were arrested near Pensacola, Florida, and both asked for a preliminary hearing before Honorable James M. Crossgrove, United States Commissioner. After the hearing, the Commissioner recommended that a warrant be issued for their removal to the United States District Court for the Middle District of Tennessee, in which Nashville is located, where the robbery of the federally-insured bank took place.

On the trial of the case in the District Court in Nashville, appellants filed a motion to suppress the evidence on the ground that such evidence, on which the Government relied to prove the bank robbery in question, was secured by an unlawful search and seizure, without a warrant, on the part of the state officers of Florida, and the agents of the Federal Bureau of Investigation, in violation of appellants' rights under the Fourth Amendment to the Constitution.

The man, whose premises were searched and whose briefcases were also unlocked and searched, and the evidence therein used on the trial of the case to convict appellants, was found unconscious by the roadside near Pensacola. The first officer on the scene stated he thought the man might be a diabetic because of a small emblem he wore suspended from a chain around his neck; and that a number of persons who were there and saw the man in that condition thought he might be a diabetic. The emblem worn by the man is well-

known to emergency departments of hospitals, and by officers of police departments; and when they see such an emblem, they immediately identify the wearer as a diabetic. These emblems may be purchased at almost any drug store throughout the country. The only reasonable conclusion to be drawn when a man is found suffering a seizure, and is wearing a diabetic emblem around his neck would be that he is a diabetic suffering from a diabetic seizure.[1]

The transcript of the evidence and testimony of the witnesses before the Commissioner in Pensacola was introduced in evidence on the hearing in the District Court in Nashville. After due consideration, and upon reviewing the transcript of the evidence taken before the Commissioner, the District Court denied appellants' motion to suppress the evidence on the ground that it was not well taken. The trial then proceeded and resulted in the conviction and sentence of appellants.

The evidence sought to be suppressed consisted of thousands of dollars in bills found in locked attaché cases, which were found in appellant Dunavan's immediate possession. These bills had been taken in a hold-up of a national bank in Nashville, Tennessee.

The evidence of money found in the attache cases was only part of the evidence used to convict. There was testimony from a number of eye witnesses that appellants were the men who held up the Nashville bank, and there were films taken, by hidden cameras, during the hold-up that purported to show appellants were the hold-up men. Accordingly, the evidence sought to be suppressed was only part of the evidence against appellants; and it is only the search of the premises of appellants and of their attaché cases upon which the motion to suppress is based.

The Government contends that the search came within one of the exceptions to the Fourth Amendment since it was made by officers confronted with an emergency in an effort to save the life of one of the appellants; that the search was carried out in an attempt to locate information as to the nature of his illness, and of his identity; and that the exigencies of the situation made that course imperative.

Appellants contend that the search of their rooms did not fall within one of the exceptions to the Fourth Amendment, requiring a search warrant; that when the officer who arrived at the scene and found that the man, who is one of the appellants, was unconscious and was wearing a chain around his neck with an emblem such as diabetics wear, he had every reason to know that the man was suffering a diabetic coma or seizure; that the hospital to which the man was transported, saw the man and found the chain around his neck holding the diabetic emblem, knew he was in a diabetic coma; and that there was no need

---

1. A diabetic "should carry at all times some form of identification, preferably a bracelet or amulet stating that he is a diabetic." Textbook of Medicine, Beeson & McDermott 13th Edition 1971; W. B. Saunders Company, Philadelphia-London-Toronto. "[A]nyone susceptible to reactions should always carry identification for diabetes to help strangers understand and render necessary assistance. *The Identification Card* issued by the American Diabetes Association is recommended for this purpose. But there are also other forms of identification, such as metal and plastic wristbands, or lockets to be worn around the neck." ADA Forecast, published by the American Diabetes Association, Inc. 1967. "A * * * way of identifying the dia- betic with an insulin shock is to ask for it (or, if possible, search for, if the person cannot act for himself) a diabetic's identification card. The American Diabetes Association has for years advised all diabetics who use insulin to carry such a card, which may be in the wallet or purse. Some diabetics may wear an identification bracelet, watchband, or necklace." Facts About Diabetes, Insulin Reaction And Police Protection, William H. Grishaw, M.D., Chairman, Committee on Information for Diabetics and Member of the Board of Directors, American Diabetes Association, October, 1960, issue of "The Police Chief," published by the International Association of Chiefs of Police, Inc., Washington, D.C.

of a search of appellants' premises and a search of his locked dispatch cases to secure information in order to telephone the hospital and inform those in charge that the man was a diabetic.

It further appears from the records kept by the deputy sheriff, who first arrived at the scene where he found appellant in a coma, that appellant had been discharged from the hospital, immediately arrested, and booked for the offense of not having a valid driver's license, before any search of appellants' premises or attaché cases was carried out by the police.

The whole issue in the case is whether the search without a warrant, and seizure of the evidence by the Florida State officers and the agents of the Federal Bureau of Investigation, were in violation of appellants' rights under the Fourth Amendment as constituting an illegal search and seizure, requiring that such evidence be suppressed on motion of appellants.

We are of the opinion that the search and seizure of the evidence used to convict appellants was a search and seizure in violation of appellants' rights under the Fourth Amendment, and that the evidence seized as a result of such search should have been suppressed.

In McDonald v. United States, 335 U.S. 451, 453, 69 S.Ct. 191, 192, 93 L.Ed. 153, the Supreme Court declared:

"The Fourth Amendment to the Constitution provides: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. * *

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home."

This strange case starts with the testimony of Sergeant Gearen of the Air Force before Commissioner Crossgrove in Pensacola on the preliminary hearing. Sergeant Gearen was sightseeing with his family along the beach at Pensacola and was driving his car out to Fort Pickett when he saw a car coming toward him "going off and on the road on both sides of the road." Sergeant Gearen had to take the right shoulder to keep from getting hit. The other car went by him on his side of the road, and as he watched it in the rear-view mirror "it kept going in the sand and back on the road." Sergeant Gearen then went on down to the main gate at Fort Pickett and asked the gate guard to call the police. He then got into his car, turned around and followed the other car. When he had gone "up the road a piece," the other car had run off the road into the sand, and stopped while the motor was still running. Sergeant Gearen backed his car off the road and "just sat there awhile. I wanted to go but my wife didn't want me to. It was plain to see something was wrong with the driver. He wasn't acting right. I saw the fire underneath the front of the car. Grass caught on fire. I told her I was going anyway. Got to take the driver out of the car. Another car parked behind me and I

asked this guy if he would go with me. He said, yes, he would go. * * * He asked the girl to bring the fire extinguisher. He put the fire out underneath the car and I opened the door and took the guy out of the car. * * * I opened the car door, and as I opened the car door he kind of turned his head toward me. I said, 'Hey, buddy, get out of the car.' He said, 'what is happening, Babe?' I put my hands under his arms to pull him out. He had his grip * * * on the steering wheel. I broke his grip on the steering wheel and pulled him out. * * * I think I reached in and turned the ignition on the car off. First thing the other guy put the fire out. The other guy came around to where I was at. Didn't know what was happening with [the driver]. Seemed like he was choking. *I knew he was either diabetic or epileptic.* * * I set him up first because I was afraid he would choke on his tongue." (Emphasis supplied.)

Sergeant Gearen testified that the man was wearing something like a religious medal around his neck. Another man who came up helped Sergeant Gearen "check" the pockets of the man with the seizure, and found about nine hundred dollars. Gearen, in the company of another man, removed the keys from the ignition and opened the trunk of the car. They saw two attaché cases, and closed the trunk without removing them.

In the hearing before Commissioner Crossgrove, Deputy Sheriff Lewis A. Davis of the Escambia County Sheriff's Department, testified that he had received a call at his station at 4:06 P.M. and arrived at 4:12 P.M. at the scene where the man with the seizure was on a blanket supported in an upright sitting position by "a witness at the scene." Saliva was coming out of his mouth, his eyes were rolled back into his head. The man who was in this condition was appellant Dunavan. Deputy Sheriff Davis stated:

"I checked the chain, he had a chain with a little emblem around his neck, because diabetics carry that sometimes."

He was asked by the District Attorney:

"Q. Did you think he might be a diabetic?

"A. Yes sir. A number of people saw him and thought he might be in that condition from a diabetic condition."

Deputy Davis testified he was not suspicious of anything when he found more than $900.00 stuffed in appellant Dunavan's pockets. He testified that he checked Mr. Dunavan's pockets. He said:

"In his left front pocket, I believe his left front pocket, there was a money clip with five one hundred dollar bills, tens, fives and twenties. In his left rear pocket I found a number of bills just folded up and stuck down inside his pocket, but no identification. * * *

"Q. You were a little suspicious when you found that nine hundred something dollars on him?

"A. No, sir. *Not necessarily*, as a matter of fact a lot of people lose that much money up there on the beach at one whack.

"Q. *You were a little curious when you started driving to that motel room [Dunavan's], weren't you, that possibly there was a good more to this?*

"A. *I wouldn't think I was a good law enforcement officer if I wasn't a little bit curious.*

"Q. As a matter of fact he had become a suspect at that time?

"A. No, sir. I wouldn't say a suspect. If he had been a suspect he would have had a little more security on him and so forth, something like that." (Emphasis supplied.)

Deputy Davis further testified:

"Q. If he had been a suspect would you have gotten a search warrant to search that motel room?

"A. If he had been a suspect I certainly would have gotten a search warrant.

"Q. Since you felt he wasn't a suspect you didn't feel like you needed a search warrant?

"A. I didn't feel like I needed a search warrant to save somebody's life."

However, on the hearing of the motion to suppress, Deputy Davis was examined by Government counsel:

"Q. Mr. Davis, all of this investigation occurred over a very short period of time, did it not?

"A. Yes, sir.

"Q. I take it you were in a pretty big hurry, is that correct? Is that a correct statement?

"A. Yes.

"Q. *Primarily to determine what was wrong with this man Dunavan and to identify these people, is that correct?*

"A. *That's correct.*" (Emphasis supplied.)

Sergeant Gearen was the first person on the scene and lifted Mr. Dunavan out of his car. In so doing, he had a good look at appellant and thought he might be a diabetic or an epileptic, or "on a trip." He also noticed the emblem around Mr. Dunavan's neck but he didn't recognize it as the kind diabetics wear. He said he thought it was a religious medal, while Deputy Davis had every reason to believe that Mr. Dunavan was a diabetic because of the chain with a little emblem around his neck—such as diabetics sometimes carry. Deputy Davis testified that a number of people who saw Mr. Dunavan at the time thought he might be in that condition because he was a diabetic. With all of this as a foundation for his belief that Mr. Dunavan was suffering a diabetic seizure, the investigation of Deputy Davis became directed to identifying Mr. Dunavan.

According to Deputy Davis, two officers checked the vehicle and found a rental contract with the name of "James Mitchell" for the rental of the car; and

"also found a wallet containing a temporary social security card which lists the name of Robert Dunavan on it. * * * So, during this time I had a first aid vehicle from the beach come to the scene to possibly assist the man until the ambulance could arrive. After it arrived we decided to transport him back on to meet the ambulance due to his physical condition. * * So, during this time they had opened the trunk of the car and observed two briefcases in there. * * * So, I was given the keys to the car by Mr. Jones and * * * I * * * removed the two briefcases from the trunk of the car and put them in my car and went to a restaurant out on the beach, * * *."

In further testimony before Commissioner Crossgrove, Deputy Sheriff Davis stated that he caused the Dunavan car to be "towed in," and said that, afterward he proceeded to a restaurant "out on the beach, the Sunway Restaurant," where he used the telephone. Lt. Rose of the Sheriff's Department called him there in response to a radio dispatch previously sent out by Deputy Davis asking Lt. Rose to get in touch with him there. Deputy Davis told Lt. Rose that he had found a key in Mr. Dunavan's pocket to a room in the Ramada Inn, and that "there might be possibly someone at the motel that could tell us something about the man, and give us some information on him." They were concerned, in their conversations, with only who the man at the hospital might be. Lt. Rose suggested that he go to the Ramada Inn and attempt to contact somebody, and testified that he met Deputy Davis afterward at the Ramada Inn. Deputy Davis stated that when he and Lt. Rose arrived at the Ramada Inn, they discussed what they should do "and we decided to go in."

Lt. Rose testified:

"Q. I assume then the fact that there was a large amount of money on this man with no identification

aroused your suspicion as police officers somewhat, did it not?

"A. Well, curiosity more than suspicion. * * *

* * * * * *

"Q. Isn't [it] rather unusual for a man to have that large an amount of money on him?

"A. Yes, it is."

Lt. Rose further testified that "when we got to the Ramada Inn we decided to enter the room *since we had the request from the hospital* as to identity and anything we could learn about the man." This request from the hospital "as to identity and anything we could learn about the man," obviously came before Lt. Rose and Deputy Davis met at the Ramada Inn, and before they used the key to enter his room and search his premises and attaché cases. In any event, a request from the hospital as to identity "and anything we could learn about the man," was no justification for a search of his premises and effects, without a warrant. All of this search, according to the conversations between them, concerned only the desire of Lt. Rose and Deputy Davis to find out who the man at the hospital was.

Deputy Davis testified as to the search:

"When we, Lt. Rose and I, got to the room * * *, we knocked on the door and called out and no one answered. So we decided to go on in the room and see if we could find some identification or information or something to give the hospital about Mr. Dunavan. * * * So then, of course, we walked on into the room looking for some identification or something, and as I walked past the suitcase sitting immediately on my left I observed a pistol laying in the open suitcase. Then there was a coffee table or stand between the two beds. * * * So, on this table there was some keys, some small keys. So, we brought the briefcases up to check the briefcases assuming actually since they were in his immediate possession and so forth there should be something with identification and so forth. So, I brought the briefcases up and used the keys to unlock one of the briefcases."

The testimony of the officers discloses that the search of Mr. Dunavan's room and effects was not directed to finding out what was wrong with Mr. Dunavan.

Lt. Rose testified:

"Q. You say you found some insulin or needles in the bathroom?

"A. Yes, sir.

"Q. *Was that right away after you got into the room?*

"A. Yes, sir. It was." (Emphasis supplied.)

But, although this was soon after the officers entered the room, it was not soon enough to prevent a search of appellant's attaché case.

Deputy Davis was asked on cross examination:

"Q. The attaché cases were opened, * * * before anyone looked in the bathroom to see if there was anything in there, is that correct?

"A. Yes. One was opened."

When the briefcase (attaché case) was opened, they found thousands of dollars in bills packed in. They then sent another man to the hospital to get the key to the other briefcase; and, in some way, he got the key from the hospital, and they then opened the second briefcase. Both briefcases were filled with money that had been taken in a hold-up of a bank in Nashville. It was this search of Dunavan's motel room, and the search of the briefcases that appellants contend was illegal and in violation of the constitutional guarantee against unlawful searches and seizures.

Deputy Sheriff Davis further testified from his records. He was asked:

"Q. Now, Lt. Davis, do your records indicate at what time on Sunday afternoon Mr. Dunavan was booked into the jail there in Pensacola?

"A. That he was actually booked?

"Q. Yes.

"A. Well, the records don't show that Mr. Dunavan was actually booked at the jail. Robert Arnold Diamond, one of the names that Mr. Dunavan was using, was booked there at 4:59.

"Q. Four fifty-nine. It is the same man that you were talking about here? '

"A. Yes. This is the time that this appendix was made out. The charge was placed against him, in other words. I can't say positively exactly when he was brought in there.

"Q. The charge was placed at 4:59?

"A. Yes.

\*  \*  \*  \*  \*  \*

"Q. Do you have any record of what time it was that you made contact with Lt. Rose?

"A. Lt. Rose, I believe I do have. In conversation I talked to him at about 4:45. I contacted him at 5:15.

"Q. You contacted him at 5:15, do you mean you saw him at that time?

"A. That's right.

"Q. Now, when you talked with Lt. Rose first you had not gone to the motel at that time, had you?

"A. No.

"Q. Do your records reveal when you arrived at the motel?

"A. Five-fifteen."

On redirect examination, Deputy Sheriff Davis testified:

"Q. *When was Mr. Dunavan arrested?*

"A. When was he arrested?

"Q. Yes.

"A. *When he was released from the hospital.*

"Q. Do you have a record of that?

"A. Yes.

"Q. When is that?

"A. *Well, he was actually booked on the—4:59 p. m. on the 17th day of May.*

"Q. He was booked at the police station at 4:59 p. m?

"A. Well, this is when the appendix was drawn up. This is the time that was—

"Q. (Interposing) Well, would he have been physically present there at the police station at that time?

"A. *I believe that he probably was. I wasn't there at the station when he was transferred from the hospital, but he wasn't in the hospital too long.*

"Q. Do you mean, Mr. Davis, that you came upon this man at 4:12 p. m. whom you thought was going to die and at 4:59 he was in the police station going to jail?

"A. *I'm not sure if he was actually there at the station or not but he wasn't at the hospital too long after they gave him some shots."*

(Emphasis supplied.)

According to the foregoing, the records from which Deputy Davis was testifying showed that Mr. Dunavan had been charged with the offense of not having a valid driver's license, released from the hospital and arrested by the police at 4:59, and thereafter booked for the offense. This time period of 4:59 P.M. was before Deputy Davis and Lt. Rose met at the Ramada Inn, which was at 5:15 P.M. after which they used Mr. Dunavan's key to open the door of his room, and proceeded to search the room and the attaché cases.

In view of the fact that Mr. Dunavan already had been released from the hospital and was in the hands of the police, who were booking him, there could have been no conversation over the telephone between Mr. Davis, Lt. Rose, or any other members of the police *informing the hospital authorities with a view to helping Mr. Dunavan recover from his unconsciousness, or treating his illness at the hospital, as Mr. Dunavan was no*

*longer at the hospital.* As Deputy Davis said, "he wasn't at the hospital too long after they gave him some shots;" and the hospital, after Mr. Dunavan was released, might have informed the police officers at the Ramada Inn that "he was feeling better."

Up to this time we do not know what charge was made against Mr. Dunavan. The examination continues:

"Q. What charge was sworn out against Mr. Dunavan or Diamond at 4:59?

"A. Failure to have vehicle under control. No driver's license was the actual charge. No valid driver's license.

\*   \*   \*   \*   \*   \*

"Q. Who pressed this charge of no driver's license against Mr. Dunavan? Did you?

"A. I charged him, yes.

"Q. Was he ever tried on that charge?

"A. I believe the case was dismissed or withheld after he was charged with bank robbery.

"Q. (Deputy) Davis, did you charge him with no driver's license so that you would be sure you could hold him in case he got well enough to leave the hospital?

"A. He was driving a car and he didn't have a driver's license. And so I charged him with no valid driver's license."

Deputy Davis had never spoken a word to Mr. Dunavan and considered that he was unable to speak at the time he charged him with the offense of not having a valid driver's license. He never asked whether he had a valid driver's license. Under the circumstances, it seems unlikely that Deputy Davis would file such a charge against a man to whom he had never spoken and who, he supposed, was in an unconscious state at the hospital, unless it was to hold him in case he got well enough to leave the hospital.

The examination of Deputy Davis continued:

"Q. Now, when you arrived at the Ramada Inn with these other officers, was Lt. Rose there at that time?

"A. Yes.

"Q. And was it at his direction that you opened the door to the motel room and went in?

"A. The two of us discussed what we should do and we decided to go in.

"Q. And by this time you had already charged him with, Mr. Dunavan with no driver's license?

"A. This was at about the time of the known violation. This was when it was decided that there had been a violation and he would have actually, in other words; when he should've been taken into custody for this. This is about the time, in other words, should've been about the time that we had an officer go to the hospital where Mr. Dunavan was and I believe we had an officer there with him probably from that time on."

Deputy Davis, testifying from his records, said that he had charged Mr. Dunavan with the offense of not having a valid driver's license at 4:59 P.M. So this charge was made against Dunavan before Deputy Davis and Lt. Rose searched his room.

Representatives of the Federal Bureau of Investigation were called into the case by the state officers, and one of them opened the second attaché case containing the money secured by the bank robbery.

Finally, Deputy Davis was questioned by counsel for appellants, and testified:

"Q. Actually, his recovery had been made, I take it, before you ever went to search the motel room?

"A. No, sir."

Counsel for the Government objected to the question asked, as leading, because Deputy Davis had been called as a witness by counsel for the defense. Judge Gray agreed that the question was leading and "pretty speculative, too." At the time the question was asked, Judge Gray was right in saying it was speculative. But this was before any evidence had been introduced in which Deputy Davis and Lt. Rose admitted they did not meet at the Ramada Inn until 5:15, and afterward unlocked the door to appellant's room, and proceeded to search the premises. This took place after Mr. Dunavan had been released from the hospital, arrested, and booked by the police. So the actual fact was that Mr. Dunavan's recovery had been made before the officers ever searched his motel room and attaché cases, if recovery from a diabetic shock is to be judged from the fact that, after the necessary "shots" had been administered to him, and he was feeling better, the hospital had released him. It is unreasonable to conclude that when a hospital had received a diabetic suffering from shock, and had administered the necessary treatment for his recovery, it would discharge the man before recovery from the shock. No doctors, nurses, or hospital attendants were called upon to give evidence by the Government.

The sole justification for the action of Deputy Sheriff Davis and Lt. Rose in using the key found in Mr. Dunavan's pocket to unlock the door to his room, and to search the room and appellants' locked attaché cases, was because of an exigency that made such a search permissible as an exception to the Fourth Amendment due to an emergency in which they were attempting to save the life of Mr. Dunavan, who they thought was dying. It was claimed they were trying to secure information that would enable the hospital to know from what Mr. Dunavan was suffering, and to use medical science and care to save him.

There was no emergency at the time of the search which was carried out after 5:15 P.M. Mr. Dunavan's life was not in danger at that time, since he had recovered from the diabetic coma, and had been released from the hospital at 4:59 P.M. and was arrested and booked by the police as soon as he was released from the hospital, according to the testimony of Deputy Sheriff Davis.

Repeatedly it was testified to by Deputy Davis that appellant Dunavan was released from the hospital and arrested at 4:59 P.M.; and repeatedly it was testified to by Deputy Davis that he and Lt. Rose did not commence the search of appellants' premises and locked attaché cases until after 5:15 P.M. At no time during the trial was it stated that Deputy Davis was mistaken in stating that Mr. Dunavan was released from the hospital and arrested at 4:59; and that the search of the premises commenced after 5:15. And no claim is made of any such mistake or misstatement in the briefs of the Government on appeal. Those two time periods recur again and again in the case.

Neither was there any basis for a claim that the search was necessary to attempt to secure information in order that the hospital could be informed of the nature of Mr. Dunavan's affliction. Mr. Dunavan was wearing a chain around his neck with an emblem such as diabetics often wear. Even Deputy Davis observed the chain with a little emblem around Mr. Dunavan's neck. Upon his arrival at the hospital, they knew immediately from the emblem, if nothing else, that Mr. Dunavan was a diabetic and suffering a diabetic shock.

The fact that Mr. Dunavan was taken by the first-aid vehicle from the beach at 4:30, thereafter changed to an ambulance, and transported to the hospital; treated there with "shots," according to Deputy Davis, and released within half an hour, shows that the hospital knew the nature of his affliction and did not require any further information to take care of the man; and they knew the nature of his affliction because he was wearing a chain around his neck holding an emblem that disclosed he was a dia-

betic—the same emblem that Deputy Davis had first noticed Mr. Dunavan was wearing at the beach—"a little emblem around his neck because diabetics carry that sometime."

Even if the officers, before they entered appellant's room at the Ramada Inn, had a request from the hospital as to the identity of Mr. Dunavan, and everything they could learn about him, the compliance of the officers with such a request would not excuse them from securing a search warrant to seach his rooms.

It seems obvious why the search was being conducted—because the officers were suspicious of the large amount of money found on Mr. Dunavan. As stated by Mr. Justice Butler, speaking for the Supreme Court in Agnello v. United States, 269 U.S. 20, 32, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145:

> "The protection of the Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. * * * Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

After finding Mr. Dunavan in a state of unconsciousness, with more than nine hundred dollars in numerous bills stuffed in all of his pockets, the officers were suspicious of something, and after finding the key to Mr. Dunavan's motel room in his pocket, they determined that they would see whether there was any evidence of illegal activity, or at least have a search on general principles, because they were admittedly curious. But, as held in District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, aff. 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599, the Fourth Amendment precludes searches of premises by officers without a warrant, regardless of whether the officers are searching for evidence of crime, or whether they are seaching for something else, or just searching.

As Judge Gray said, in passing, he always carried his motel key and that if any accident happened to him, he would be glad to have officers search his room and belongings to find out who he was. Coming from one of Judge Gray's eminence, this statement is sound and salutary, and certainly most men would agree completely and welcome assistance. It is to be said that there are many men who do not find their world so felicitous, and would avoid such an intrusion to ascertain their identity, even in case of accident or illness, with all means at their command to the point of relying upon the Fourth Amendment to prevent it. We do not know the number of men who carry with them in their locked suitcases or attaché cases, or keep within locked drawers, letters or documents that might be technically incriminating, or more incriminating than merely technical; or who have letters that they would not have anyone in the world see involving their domestic affairs, or liaisons, or conduct that, while it would not be criminal, would subject them to shame and embarrassment, or lead to the break-up of families and destruction of friendships and loss of standing in their communities. The searching of premises, the unlocking or breaking open of drawers or attaché cases in order to ascertain the identity of an injured or ill man is not a specifically-established and well-delineated exception, so jealously and carefully drawn as to justify such a search without a warrant.

In this regard, Mr. Justice Stewart, speaking for the Court in Coolidge v. New Hampshire, 403 U.S. 443, 454, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, made this powerful statement of the law:

> "Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable

under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' [United States v. Jeffers, 342 U.S. 48, 61, 72 S.Ct. 93, 96 L.Ed. 59]"

The striking fact about this case is that the entire period of time between the arrival of Deputy Sheriff Davis at the scene where he found Mr. Dunavan suffering from a diabetic seizure, to the time of Mr. Dunavan's release from the hospital after being treated for the affliction was unusually short.

In cross examination by counsel for the Government, Deputy Davis testified:

"Q. Mr. Davis, all of this investigation occurred over a very short period of time, did it not?

"A. Yes, sir.

"Q. I take it you were in a pretty big hurry, is that correct? Is that a correct statement?

"A. Yes.

"Q. Primarily to determine what was wrong with this man Dunavan and to identify these people, is that correct?

"A. That's correct."

To sum up the facts substantiating this statement, of how short was the period of investigation of Mr. Dunavan, Deputy Davis had previously testified that he arrived at the scene of action where Mr. Dunavan was found at the roadside, with a diabetic seizure at 4:12 P.M. on Sunday, May 17, 1970. He stated that he had then called for an emergency first-aid vehicle to take Mr. Dunavan to meet the ambulance that had been summoned; that the emergency vehicle arrived in about 15 minutes, possibly around 4:30 P.M.; that Deputy Davis sent out a radio message for Lt. Rose to call him at the Sunway Restaurant out on the beach, and he had received this call and spoke to Lt. Rose by telephone at the restaurant at 4:45 P.M.; that Mr. Dunavan, between 4:30 P.M. and 4:59 P.M. had been transported by the emergency vehicle and then by the ambulance; had reached the hospital; been treated there with "shots," and had been discharged from the hospital, and immediately arrested there by police on the charge of not having a valid driver's license; and had been booked by the police at about the same time; that Deputy Davis first saw Lt. Rose at the Ramada Inn at 5:15 P.M. and that they had proceeded to search Mr. Dunavan's room and his attaché cases. Since Mr. Dunavan was transported from the beach in the first-aid vehicle and then, later, in the ambulance, he could probably not have reached the hospital for treatment of his diabetic seizure within ten or fifteen minutes. Mr. Dunavan, therefore, would have been at the hospital receiving the shots for approximately only fifteen minutes—until the hospital considered his treatment sufficient to discharge him.

Diabetics suffering from an insulin reaction often recover from an unconscious condition in a remarkably short time—from ten to fifteen minutes.[2]

---

2. "In 1921 a young Canadian surgeon, recently back from service in World War I, and a young Canadian graduate student performed one of the most notable experiments in medical history. Into dogs dying of diabetes—brought on by removal of the pancreas—the researchers injected an extract obtained from the pancreas of a normal dog. The dogs didn't die.

"The surgeon and the graduate student—Frederick Grant Banting and Charles H.

Best—tested the safety of the new extract by injecting it into themselves. Then on Jan. 11, 1922, it was given for the first time to a diabetic patient.

"In those days, an adult with diabetes had a life expectancy of only five or ten years. But many of the patients treated with the new extract in 1922 are still living, and today the life expectancy of the adult diabetic approaches the average for the general population.

It has been suggested that the testimony of Sheriff Davis that appellant Dunavan was discharged from the hospital at 4:59 P.M. and then arrested, and booked, was hearsay, since Mr. Davis was not present when appellant Dunavan was discharged from the hospital and thereafter arrested, and booked. But Mr. Davis was the officer in charge of the whole case. His testimony as to when appellant Dunavan was discharged from the hospital and arrested, and booked, was from police records which he referred to when he testified. Title 28 U.S.C.A., Sec. 1732, The Federal Business Records Act, provides for evidence from business records; and, according to United States v. Graham, 391 F.2d 439 (C.A.6), certiorari denied, Tucker v. United States, 390 U.S. 1035, 88 S. Ct. 1433, 20 L.Ed.2d 294, police records are business records. Moreover, there was no objection from either party as to the testimony of Mr. Davis from the police records. He was the chief representative of the police involved in this case and, from everything that appears, his testimony from the police records is accepted as true by everyone. It should be mentioned that when it was pointed out to Mr. Davis that he testified that appellant Dunavan was discharged from the hospital, arrested and booked at 4:59, whereas he further testified he did not search appellant's apartment and dispatch cases until after 5:15 P.M., and that, therefore, he knew Mr. Dunavan was discharged from the hospital before he commenced his search to ascertain what Mr. Dunavan was suffering from, he denied it. But he continued to testify that he had not commenced his search until 5:15 P.M., and that Dunavan had been released at 4:59 P.M., and at no time stated that he was mistaken with regard to the times of search, and of arrest.

There was some testimony with respect to the hospital's calling the officers at the motel and the officers calling

"What Banting and Best discovered was, of course, the life-giving hormone, insulin." Facts about Diabetes, published by the American Diabetes Association, Inc., 1966, New York.

"If diabetic coma is suspected, immediate medical attention is mandatory; without treatment, diabetic coma results in death. "The opposite condition, insulin reaction (or 'insulin shock,' known medically as 'hypoglycemia,') appears more rapidly and is much more common than diabetic coma." Some Facts About Diabetic Inmates of Correctional Institutions, Franklin B. Peck, Sr., M.D., March-April issue, 1962, of American Journal of Correction. "Before breakfast, a normal man of average size has about a teaspoon of sugar in his blood. The amount rises somewhat after eating but never goes very high. In a diabetic, on the other hand, the amount of sugar is likely to be considerably higher than normal even before the day's first meal and to rise more than normally afterward. Insulin given by injection lowers the sugar level. "Sometimes the level drops too far or too fast. It may do this if the diabetic has taken too much insulin, or if he hasn't eaten enough, or if he has played or worked harder than usual. "When this happens, something called an insulin reaction begins to develop. * * *

In severe reactions, a diabetic may be irritable, laugh or cry without cause, talk thickly, stagger drunkenly, or even become unconscious.

"*If the patient gets a little carbohydrate quickly*—in the form of sugar, for example, or of candy, crackers, soft drinks, orange juice—*the symptoms are likely to disappear within ten minutes.* That's why many diabetics carry a few lumps of sugar or several crackers in their pockets or handbags. "The treatment may have to be repeated, and in severe cases a doctor may have to inject glucose. "A new hormone called *glucagon*—developed late in 1960—largely eliminates the need for intravenous injection of glucose in such emergencies. *Injected under the skin, it has the remarkable ability to raise the blood sugar to normal levels promptly and consistently.* (Emphasis supplied.) Facts about Diabetes, supra. "Within ten minutes after receiving one ampule of glucagon the patient is usually sufficiently awake to eat. Recovery after an insulin reaction is usually prompt and complete. Often a person feels well again within fifteen to thirty minutes." ADA Forecast, published by American Diabetes Association, Inc. 1967.

from the motel to the hospital. Deputy Davis testified that *"shortly before we arrived in the [motel] room,* we received a call *from our office* by telephone that the hospital was requesting some information on Dunavan and wanted to know if we could give them any. * * * Lt. Rose found an insulin bottle in the bathroom."

"Q. And what did you do when he found that?

"A. I believe that City Policeman Officer Mr. Peebles is the one that made that call to the hospital and gave them the number off the insulin bottle and other information they asked for.

"Q. And was some information received from the hospital, too?

"A. The hospital called a number of times, called us one time at the motel, and I believe called our office on two different occasions inquiring about Mr. Dunavan."

Deputy Davis had already opened one attaché case. He was asked what he did with regard to the other and he testified:

"We did not have a key for it and so we asked one of our officers to see if he could find a key on Mr. Dunavan and bring it to us, which he did and Mr. Shook with the FBI opened this case here."

All of Deputy Davis' testimony, as above set forth, is hearsay. He did not call the hospital. He did not speak with anyone at the hospital. He did not know Mr. Dunavan was at the hospital but asked an officer if he could find a key on Mr. Dunavan "and bring it to us." All of this hearsay evidence is in direct conflict with Deputy Davis' testimony from the police records that Mr. Dunavan was released from the hospital and immediately arrested and booked at a specified time—which was before Deputy Davis entered the motel and searched Mr. Dunavan's attaché cases.

Such hearsay evidence does not appear to me to be substantial evidence to overcome the repeated and direct testimony of Deputy Davis from the police records that Mr. Dunavan was discharged from the hospital at 4:59 and that Deputy Davis did not enter the motel and search the attaché cases until after Mr. Dunavan had been released from the hospital and arrested by the police.

For substantial evidence "is such relevant evidence as a reasonable man might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

But after all is said on the subject of whether the officers called the hospital from the motel and whether the hospital called the officers at the motel, or whether the officers searched Mr. Dunavan's attaché cases before, or after, communicating with the hospital, the fact that clearly stands forth is that Deputy Davis and the doctors and nurses at the hospital knew from the diabetes amulet that Mr. Dunavan was wearing around his neck that he was a diabetic suffering from diabetic shock and, consequently, there was no need to search his motel room and attaché cases to ascertain this fact. And, if there was no need to search the motel room and the attaché cases to secure this information, the search clearly was in violation of appellants' rights under the Fourth Amendment.

With regard to the search of appellant's apartment and effects, because of the emergency arising from his dangerous condition in which Mr. Davis testified he found appellant Dunavan at 4:21 P.M., it appears that from that time until after 5:15 P.M., when he searched the premises and attaché cases of appellant, he had not notified the hospital of anything regarding Mr. Dunavan. Mr. Davis, therefore, according to his own testimony, let more than an hour pass without communicating with the hospital respecting Mr. Dunavan's condition. In Mr. Davis' mind, there was no emergency justifying the search of the attaché cases which he had in his hands, at the time he sent Mr.

Dunavan to the hospital, and which he did not search until an hour later.

Appellants Dunavan, and Mitchell, who occupied the motel room together, were both convicted by the use of the evidence seized by the state and federal officers as a result of the search of the premises they were sharing, as well as by much additional evidence. The evidence which was procured as a result of the search and seizure, without warrant, was, in my view, in violation of appellants' rights under the Fourth Amendment.

In accordance with the foregoing, I am of the opinion that the judgments should be set aside, and the case remanded for a new trial.