**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Orville DUNAVAN,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Edward MITCHELL,**
**Defendant-Appellant.**

**Nos. 71–1378, 71–1379.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1971.

Decided Oct. 5, 1973.

Dale Quillen, Nashville, Tenn., on brief for appellants.

Ira E. Parker, III, Asst. U. S. Atty., Nashville, Tenn., for appellee; Charles H. Anderson, U. S. Atty., on brief.

Before WEICK and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

Appellants Dunavan and Mitchell appeal from convictions for robbing a federally insured bank of approximately $40,000 in violation of 18 U.S.C. § 2113(d) (1970). Each was sentenced to 12 years after a jury trial in the United States District Court for the Middle District of Tennessee.

On May 11, 1970, the Green Hills Branch of the Third National Bank in Nashville, Tennessee, was held up and robbed.

On May 17, 1970, appellants Dunavan and Mitchell were arrested at Pensacola, Florida, and found to be in possession of proceeds of the Green Hills Branch bank robbery. The circumstances leading to the arrests produce the two appellate issues in this appeal.

At about 4 p. m. on Sunday, May 17, 1970, appellant Dunavan was found by passers-by at a beach near Pensacola, Florida, in a disabled car which had set the grass on fire below it. He was foaming at the mouth and unable to talk. They removed him from the car, put out the fire, and went through the automobile seeking to identify him, thereby finding a Social Security card, $961 in cash, a motel key, and a car rental agreement for the automobile in appellant Mitchell's name. They also found two locked briefcases and called the police. All of these items were turned over to a Deputy Sheriff, who dispatched Dunavan to the hospital and then went to the motel, taking the briefcases with him. He testified that he and other officers who saw Dunavan at the scene "thought he was going to die," and that he and two other officers entered Dunavan's motel room with the key which had been turned over to him:

So, we decided to go on in the room and see if we could find some identification or information or something to give the hospital about Mr. Dunavan.

In the motel room the officers found two small keys which opened one of the briefcases. It was full of money, banded with Green Hills Branch Bank bands, marked with red dye and smelling of gas. Some of the money was "bait" money (identifiable) and the dye and gas resulted from a bank anti-robbery device.

The officers had seen a woman emerge from an adjoining room as they arrived and had seen that the door was open between the two rooms. On questioning this woman they learned that one of two men occupying the rooms was a diabetic and kept his insulin in one of the briefcases. After an officer was sent to the hospital to get a key to it from Dunavan, this case was then opened. The insulin and a syringe were found, along with a lot more money marked like the money in the first case.

With a description of Mitchell and information as to his whereabouts from the same woman, two officers then arrested him for "vagrancy" and brought

him back to the motel rooms. There Mitchell was warned of his constitutional rights and questioned. He denied knowing anything about the money but gave an account of his whereabouts prior to being in Pensacola, which the government was able at trial to contradict.

On appeal appellant Dunavan contended that the District Court erred in failing to suppress the evidence seized in the two briefcases because it had been seized in violation of the Fourth Amendment.

■ Appellant Mitchell made the same Fourth Amendment contention and also claimed that he had been illegally arrested and, hence, it was error to admit his statement made to the officers while in custody in the motel room.

On this court's first consideration of this appeal, 464 F.2d 1166, we were unable to ascertain with certainty from the record the time relationship between appellant Dunavan's hospitalization, his treatment there, and his release from the hospital and the happening of the search of the first briefcase which provided obvious probable cause for the officers to believe they had a bank robbery on their hands.

The case was thereupon remanded to the District Court "for such additional hearing and findings as may be required to answer the following question:

> Whether the police knew that Dunavan had recovered consciousness and been released from the hospital 1) when they entered his motel room, and 2) when they opened the first briefcase?"

At the hearing on remand the District Judge heard four witnesses, including the emergency room nurse at the hospital concerned, one of the officers who participated in the motel room search, the officer who went to the hospital to get the key to the second briefcase, and the officer who kept the police dispatch log.

The District Judge made the following findings:

Based upon the testimony and exhibits introduced at the January hearing and relevant testimony taken at the trial and at the previous hearing on the motion to suppress, the Court finds that the defendant was brought to the hospital on May 17, 1970, while unconscious, and was given an intravenous injection of Sodium Amytal at 4:43 p. m., was finally given an injection of Dextrose at approximately 6:25 p. m., and, as a result of the latter injection, regained consciousness sometime after 6:30 p. m. He definitely was not conscious before the 6:25 injection. The Court also finds that the police officers entered the motel room at approximately 5:15 p. m. on the same day and that the first briefcase was opened a few minutes thereafter, probably about 5:20 p. m. It is manifestly clear, therefore, that the police not only did not know the defendant had regained consciousness when they entered the room and when they opened the first briefcase, he in fact had not regained consciousness at those times.

In relation to both appellate issues stated above, we deem the first and the critical problem to be whether the officers who opened the first briefcase taken from Dunavan's car did so, as they asserted, as a matter of rendering emergency aid to a person in a seizure, or whether this explanation of their search was a pretext.

The record we have reviewed clearly supports the finding quoted immediately above. The District Judge had originally denied the motion to suppress evidence, holding that the officers' conduct was pursuant to a lawful lifesaving mission. The additional findings lend added weight to that view.

Appellants, as we read their briefs, do not appear to dispute the proposition that a lawful entry on private premises may be made by law enforcement officers for emergency life-saving measures.

No emergency life-saving exception to the Fourth Amendment's warrant re-

quirement appears to have been spelled out in any Supreme Court case up to this point. But cases in both the Eighth Circuit and the Second Circuit do support it.

In one of these, the Eighth Circuit said:

> For purposes of the instant case, the emergency or exigency doctrine may be stated as follows: police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance. In applying this doctrine, two principles must be kept in mind. (1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. McDonald v. United States, 335 U.S. [451] at 456, 69 S.Ct. 191 [93 L.Ed. 153]; United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). (2) An objective standard as to the reasonableness of the officer's belief must be applied.

> " * * * [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. * * * And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Root v. Gauper, 438 F.2d 361, 364–365 (8th Cir. 1971).

*See also* United States v. Goldenstein, 456 F.2d 1006 (8th Cir. 1972).

If anything, the Second Circuit's holding is more emphatic:

The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law. See generally Read v. Case, 4 Conn. 166 (1822). Indeed it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly. See Wayne v. United States, [115 U.S. App.D.C. 234, 318 F.2d 205, cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L. Ed.2d 86 (1963)] supra (Burger, J., concurring). United States v. Barone, 330 F.2d 543, 545 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964).

Over and above such cases, there is explicit recognition of an emergency doctrine in dictum from several cases of the Supreme Court. In a case holding the search there involved to be unlawful, Justice Douglas observed:

> This is not a case where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name of the law. McDonald v. United States, 335 U.S. 451, 454, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948).

*See also* United States v. Jeffers, 342 U.S. 48, 51–52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1947).

■■ We are aware that there may be cases where police assertions of Good Samaritan motives might (as charged here) be pretextual rather than real. On the other hand, particularly in big city life, the Good Samaritan of today is more likely to wear a blue coat than any other. While we believe the government would have the burden of proving the defense (as it clearly has done here), we agree with the holdings of the Eighth and Second Circuits quoted above, that a legitimate life-saving purpose may provide another example of the exigent cir-

cumstances which excuse failure to follow the warrant requirements of the Fourth Amendment.

■■ We find no merit as to appellant Mitchell's claim of error in admitting his statements after arrest and appropriate Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The fact that he was told that he was being arrested for vagrancy and that the Florida vagrancy statute was subsequently declared unconstitutional (Smith v. Florida, 405 U.S. 172, 92 S.Ct. 848, 31 L.Ed. 2d 138 (1972)) does not in our view serve to make his arrest unlawful or his statements inadmissible. When the police officers once opened the first briefcase, they had positive evidence before their eyes that they were on the trail of bank robbers. They knew that Mitchell and Dunavan were traveling together and were occupying adjacent motel rooms with the door open between them. The briefcase had been found in a car which they knew Mitchell had rented. If they had not arrested him, they would have been derelict in their duty as peace officers. We do not condone telling a person that he is being held for an offense other than the one which actually motivated the arrest. But this is one occasion where a constable's blunder does not so offend constitutional rights or fundamental justice as to require that a guilty man goes free.

This Circuit and the Eighth Circuit have dealt squarely with cases where the arresting officers actually were in possession of probable cause to arrest but gave the person arrested either pretextual or illegal reasons for the arrest. United States v. Clemmons, 390 F.2d 407 (6th Cir. 1968); Thunder Horse v. South Dakota, 456 F.2d 1262 (8th Cir. 1972); Klingler v. United States, 409 F.2d 299 (8th Cir. 1969).

■ The essence of the holding in these cases is that in dealing with a Fourth Amendment issue, the validity of an arrest is to be judged by whether the arresting officers actually had probable cause for the arrest rather than by whether the officers gave the arrested person the right reason.

The judgments of the District Court are affirmed.