**UNITED STATES of America, Plaintiff,**

v.

**John HOSTETTER, Defendant.**

**Crim. A. No. 1932.**

United States District Court
D. Delaware.

Feb. 13, 1969.

Alexander Greenfeld, U. S. Atty., and
Norman Levine, Asst. U. S. Atty., Wilmington, Del., for the United States of
America.

William J. Alsentzer, Jr., Wilmington, Del., for defendant.

## OPINION

LATCHUM, District Judge.

On December 5, 1968, the grand jury returned an indictment charging the defendant with possessing a large number of tablets and capsules of stimulants and dangerous drugs for the purpose of sale, delivery or disposal to others in violation of 21 U.S.C. §§ 331(q) (3), 360 (a) (c) (1) and 303(b) (1). The defendant moved to suppress the tablets and capsules for use as evidence on the ground that they were unconstitutionally obtained as a result of an unlawful search and seizure. At an evidentiary hearing on defendant's motion, the two Wilmington police officers [1] who seized the drugs testified concerning the circumstances surrounding their street encounter with defendant. Their undisputed testimony reveals the essential facts to be as follows:

At about 3:20 A.M. on November 12, 1968, while Officers Edward Carter and John Ciritella were cruising in their police car northerly on Market Street,[2] they noticed the defendant walking very slowly northward in the middle of the sidewalk on the easterly side of the 400 block of that street. It was cold and raining heavily. There were no other vehicles or pedestrians in sight. The police thought the defendant was dressed rather shabbily, although he wore sport clothes, a waist-length jacket which was unzippered, loafers and brown corduroy trousers. He was without a coat and tie, the condition of his clothes was somewhat "deteriorated" due to the rain and he appeared to be soaking wet. Defendant carried what appeared to be a new black suitcase. The officers decided to "stop"

defendant because their "suspicions were aroused by his black suitcase" as they "thought that possibly a burglary or a larceny had been committed." [3] As the police car approached the defendant from the rear, the officers noted that the defendant did not glance back at the car but continued to walk slowly, looking straight ahead without making any attempt to get out of the rain. The defendant was a stranger to the officers since they had never seen him before in the area although they had been working there for several months.

When the officers left the car and stopped the defendant, Officer Carter stood about two feet in front of the defendant with his back to the street and Patrolman Ciritella positioned himself immediately behind the defendant. The defendant, when stopped, made no effort to evade or avoid the police officers and made no motion toward or away from them other than at their command. When asked where he was going and his name, defendant replied the Hotel Olivere [4] and gave his correct name. Officer Carter then noticed that the defendant appeared to be under the influence of a drug or alcoholic beverage because his eyes were glazed and he was slow in answering questions. When Carter asked his first question, Officer Ciritella immediately started to "frisk" the defendant for weapons. The frisk was made by a pat-down of defendant's clothing and feeling the outside of defendant's pockets. The frisk was made not because of any movements or actions of the defendant but because it was common police procedure when confronting strangers to look for concealed weapons in the interest of their own protection. In the pat-down, Ciritella felt and removed a pocket-knife [5] with a four inch blade from de-

---

1. They were the only witnesses at the hearing.

2. Market Street is the well-lighted shopping area for center-city Wilmington.

3. The officers conceded on cross-examination that they had received no reports of a larceny or burglary in the area at the time.

4. The hotel is located at 100 West 7th Street, about three and a half blocks from the place where defendant was stopped.

5. The officer called it a "peg knife" because it had a match cover in the recess to keep the blade from fully closing and making ing it easier and quicker to open the blade.

fendant's rear hip pocket. When the knife was found, Officer Carter then picked up defendant's suitcase and searched it for other weapons.[6] No weapons were found in the suitcase but a large number of the capsules in question were discovered and seized. Upon finding the knife, Officer Ciritella testified that he advised the defendant that he was under arrest for carrying a concealed deadly weapon and continued the frisk.[7] In squeezing defendant's left-hand jacket pocket, he felt "what appeared to be pills or capsules." Whereupon Officer Ciritella reached into the pocket and pulled out a plastic bag containing the remaining capsules in question.

From these facts the question emerges whether the initial "stop" and the subsequent search was lawful. The answer to this question is found in the recent opinions of the United States Supreme Court.

■ In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that the Fourth Amendment[8] "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" is a fundamental right belonging as much to a citizen on the street as to a person within the privacy of his home; that the Fourth Amendment governs all "seizures" even though they fall short of a "traditional or technical" arrest so "that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized'

that person" within the meaning of the Fourth Amendment; and that whether the seizure is unreasonable, as proscribed by the Fourth Amendment, must be judged against an objective standard, viz. whether the facts available to the officer at the moment of seizure warrant a man of reasonable caution in the belief that the seizure was appropriate. The Court went on to point out that in justifying a particular seizure[9] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences arising from those facts, reasonably warrant the seizure because anything less would invite intrusion upon constitutionally guaranteed rights based on nothing more than inarticulate hunches. Terry v. Ohio, supra at 20–22, 88 S.Ct. 1868.

■ Turning to the facts of this case, it is clear that, when the defendant was stopped by the two police officers, he was effectively "seized" within the meaning of the Fourth Amendment. When the officers left the police car and accosted him, they positioned themselves in such a way—one standing closely in front of him while the other stood immediately behind him—as to leave no doubt in a reasonable mind that his liberty of movement was substantially restrained. But did the facts, and inferences arising therefrom, available to the officers at the moment of seizure and as credibly related to the Court warrant those officers to reasonably conclude that the defendant had committed, was committing or was about to commit a crime? I think not.

---

6. When Officer Carter was asked why his safety could not be fully protected by locking the suitcase in the police car trunk without a search, he replied that it was not his function to lock up belongings but to search them for possible weapons.

7. Officer Carter's testimony in this regard is somewhat different. He said: "When we found the knife he was then placed under arrest and charged with carrying a concealed deadly weapon. After Patrolman Ciritella finished his frisking for weapons and I finished taking a look inside the suitcase he was advised that he was under arrest on a charge of carrying a concealed deadly weapon, and at that

moment he was advised of his constitutional rights and he was taken to Central in the patrol wagon."

8. The Fourth Amendment is made applicable to the states by the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

9. The Court also held that good faith on the part of the seizing officer is not enough because if subjective good faith alone were the test, the Fourth Amendment protection would evaporate and the security thus guaranteed would remain only in the discretion of the police. Terry v. Ohio, supra at 22, 88 S.Ct. 1868.

The specific and articulate facts upon which the officers based their seizure of the defendant was that he was a stranger to them, was walking slowly in the rain at such a late hour, was somewhat shabbily dressed, and was carrying what appeared to be a new black suitcase.[10] Officer Carter testified that the specific reason why his "suspicions" were aroused was that he thought the suitcase might have been stolen as it was not in keeping with the manner in which defendant was dressed.

Yet, on cross-examination Officer Carter admitted that he used the words "shabbily dressed" to mean simply that the defendant was wearing sport clothes (a jacket, open collared shirt, corduroy trousers and loafers) rather than a coat and tie and that their "deteriorated condition" was not due to being torn or soiled but was attributable simply to being soaked with rain. Moreover, the officers testified that they had received no complaints of thefts or burglaries in the area and that at no time did the defendant attempt to flee or avoid the officers.

 Tested objectively, as *Terry* requires, I am of the opinion that these facts and the inferences arising therefrom did not warrant the conclusion of a reasonable and experienced police officer that the defendant had illegally acquired the suitcase. The defendant had not been under surveillance for any appreciable time before he was seized. He made no effort to hide, to abandon or dispose of the case, to run or avoid the police nor did he display any other furtive movements or actions. The officers' suspicions were aroused simply because his manner of dress appeared incompatible with the suitcase he was carrying. While a person's dress and accoutrements may be a factor which contributes to the suspiciousness of circumstances, it would not alone create suspicion adequate to support a forcible stop. "There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current, or intended." Sibron v. New York, 392 U.S. 40, 73, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968) (Harlan, J. concurring). Moreover, an important factor that should be taken into account in determining reasonable grounds for a forcible stop is the need for immediate action which in this case appears to be lacking. All of the facts and inferences observed and related by the officers in this case were far less suspicious than those observed by the officer in Sibron v. New York, supra, which the Supreme Court found were insufficient to justify a seizure and search of a person who had been observed over an eight-hour period talking with a number of known narcotic addicts. Thus, I find in the peculiar setting of this case that the forcible seizure of the defendant was unreasonable.[11]

 Furthermore, it appears that the immediately conducted search was also unreasonable. Again Terry v. Ohio, supra at 27, 88 S.Ct. 1868, 1883, teaches that a police officer may make a reasonable, limited search for weapons in the interest of his own protection "where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." The Court went on to hold in that case:

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably pru-

---

10. The suitcase measured 24 inches, by 18 inches, by 6 inches.

11. The officers were not even justified in stopping or seizing defendant under the Delaware investigative detention statute. 11 Del.C. § 1902. That law authorizes an investigatory "stop" upon reasonable suspicion of criminal activity and this has been interpreted by the state's Supreme Court to mean "reasonable belief," De Salvatore v. Delaware, 2 Storey 550, 163 A.2d 244, 249 (1960), which I have previously viewed as the equivalent of requiring "probable cause" as the minimum standard for permitting such seizures. United States v. Thompson, 292 F.Supp. 757, 761 (D.Del.1968). Clearly the facts and circumstances of this case do not meet this test.

dent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [cases cited]. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

■ Moreover, the scope of such a search, when justified, is very limited and is confined to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of a police officer. Terry v. Ohio, supra at 29, 88 S.Ct. 1868.

■ In this case Officer Ciritella flatly stated that he could relate no specific facts giving rise to any suspicion that defendant might be armed. He did not even have an unparticularized hunch that defendant may have possessed weapons. The undisputed evidence shows that defendant, when seized, was perfectly cooperative, made no threatening gestures, was entirely obedient to all commands, uttered no protest and answered all questions posed. Yet, the fact remains that, as soon as defendant was seized and declared his destination to Officer Carter, Officer Ciritella commenced his search for weapons by a pat-down of defendant's clothing. Officer Ciritella testified that his search for weapons was not prompted because he reasonably believed that their safety was in danger but was done as a matter of "common police procedure" in dealing with strangers. It seems abundantly clear from this testimony that the officers had no reasonable grounds for a weapons search. As is stated in Sibron v. New York, supra at 64, 88 S.Ct. 1889, at 1903:

"The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate reasonable grounds for doing so. In the case of a self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

■ The testimony in this case shows that the weapons search was not done on this basis but was immediately undertaken as a matter of course, as a "common police procedure". The United States Supreme Court holds that this is not enough and on the record before me I must so hold.[12] Similarly, Officer Carter's search of the suitcase taken from the defendant was instituted only as a result of Officer Ciritella's prior unreasonable search of defendant's person. The safety of the officers, even if a weapons search of defendant's person had been justified, could have been adequately protected by removal of the suitcase beyond defendant's reach without searching its interior.

Finally, the search of the inside of defendant's pockets and of the suitcase extended beyond what was reasonably necessary for the protection of the officers' safety. Assuming that a search had been warranted, *Terry* and *Sibron*, supra, limit the search to a pat-down of a person's outer clothing. Yet, the testimony before me indicates that the search extended into defendant's jacket pocket to remove not what appeared to the officer to be a weapon but what appeared to him to be "pills". Thus, the search, even if reasonably initiated, extended beyond the limits approved in *Terry* and *Sibron*.

On the basis of the undisputed record before me and the applicable controlling

12. Furthermore, the officers in this case appear to have exceeded the limits established by the Delaware legislature in authorizing searches for weapons of persons who have been properly stopped under the investigative detention statute. The statute permits a weapons search "whenever he [the peace officer] has reasonable ground to believe that he is in danger if the person possesses a dangerous weapon." 11 Del.C. § 1903.

law, I find that the tablets and capsules were unconstitutionally obtained by the police officers as a result of an unreasonable seizure and search of the defendant and his effects. Accordingly, an order will be entered suppressing the tablets and capsules for use as evidence in this case. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Terry v. Ohio, supra at 12–13, 88 S.Ct. 1868, 20 L.Ed.2d 889.