James R. SCHRAFF, Appellant,

v.

STATE of Alaska, Appellee.

No. 2263.

Supreme Court of Alaska.

Dec. 22, 1975.

Joseph W. Sheehan, Fairbanks, for appellant.

David Mannheimer, Asst. Dist. Atty., Catherine A. Chandler, Dist. Atty., Fairbanks, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

## OPINION

CONNOR, Justice.

James R. Schraff brings this appeal seeking reversal of his conviction for possession of cocaine. He claims that the trial court erred in refusing to suppress the tangible evidence which the state offered. He asserts that this evidence was procured through an unreasonable search and seizure of his wallet and thus contravened his constitutional rights under both the United States and the Alaska Constitutions.[1]

### I.

The facts leading to appellant's arrest and conviction are relatively undisputed.

In the early morning hours of March 29, 1974, Trooper Ahlfors of the Alaska State Troopers was conducting a routine bar check near Fairbanks, Alaska. At approximately 1:00 a.m. he entered the 49'er Club, which is a small tavern located approximately six miles from Fairbanks.

Upon entering the bar, the trooper noticed appellant Schraff and a companion, Thomas Jones, seated on the floor in a seemingly intoxicated condition. He spoke to the bartender regarding the two men and apparently was advised that during the prior afternoon the men had been drinking and had driven their car into a ditch. The car had been removed from the ditch and was placed in the 49'er Club's parking lot. The two men then had entered the club to "sober up." No complaints had been lodged against them by anyone at the time that Trooper Ahlfors entered the bar.

The trooper allegedly told the bartender not to allow the two men to drive until they were sober, and then he proceeded to the parking lot to "secure their vehicle." At this point the facts become somewhat more hazy.

---

1. The Fourth Amendment of the United States Constitution provides:

  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Alaska Constitution, Article I, Sec. 14, states:
  "The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

According to the state's brief, when Trooper Alfhors reached the vehicle he noticed that the keys were still in the ignition. It is said that when he reached in to remove the keys he noticed a quantity of marijuana on the floor. At that time, the state asserts, Trooper Alhfors contacted narcotics Investigator Charles Lewis of the Alaska State Troopers.

However, under oath Investigator Lewis testified that after discovering the marijuana on the floor, Trooper Ahlfors then discovered a "bag containing approximately 20 ounces of suspected marijuana in the back seat of the vehicle." Only at that point, Investigator Lewis testified, did Trooper Ahlfors contact him.[2]

In any event Trooper Ahlfors called in narcotics Investigator Lewis at approximately 2:00 a.m. At the time Lewis received the call, he was in his own personal car, driving home for the evening.

Upon arriving at the 49'er Club, Investigator Lewis also noticed Schraff and Jones in a seemingly "intoxicated" state. He talked with Trooper Ahlfors and then focused his investigation on Schraff and Jones alone. There were no alcoholic containers near the two men and no smell of alcohol in their vicinity.

Investigator Lewis first talked with Jones because "he appeared to be the more coherent of the two." Since he was investigating a possible criminal act, Lewis advised Jones of his rights. He then interrogated Jones concerning ownership of the car and the marijuana found therein.

After this, Investigator Lewis went over to appellant Schraff. Because Schraff appeared incapable of comprehending his legal rights, Lewis gave him no *Miranda* warnings. Lewis then asked Schraff for his identification two or three times. Schraff did not respond. At that time Jones came up to Schraff and allegedly said to appellant "Come on Jim, show him

some I.D." Schraff allegedly responded with the nebulous phrase, "No problem."

But Schraff himself did not produce any identification at that time. Instead, Jones reached into Schraff's back pocket and handed Schraff's wallet to Investigator Lewis. Lewis took the wallet and proceeded to go through it for the alleged reason of finding an identification card.

Lewis testified he flipped through the cellophane slots until he found a card with complete identification. At that point he noticed in the clear plastic panel directly across from the identification a "folded aluminum foil packet."

Lewis testified that his past experience lead him to believe that this opaque packet contained narcotics. He therefore seized and removed the packet from the wallet panel and proceeded to open it up. Inside he discovered a white powder which was subsequently determined to be cocaine. At that point he asked Schraff and Jones to accompany him to police headquarters.

Schraff was subsequently indicted for possession of cocaine. He then moved to suppress the evidence which was seized from his wallet. Judge Everett W. Hepp of the Fairbanks Superior Court denied Schraff's motion and found him guilty of possession of cocaine. From this ruling and conviction, Schraff appeals.

## II.

Appellant Schraff challenges the legality of Officer Lewis' search and seizure of his wallet, and the foil packet contained therein. He contends that this conduct violated his right to be free from "unreasonable" searches and seizures under the United States and Alaska Constitutions.

More specifically, appellant raises the following three questions:

(1) Under the facts presented did Officer Lewis have any right to search and seize appellant's wallet?

---

2. It is unknown to us whether either Schraff or Jones was ever tried or convicted on charges relating to marijuana found in the automobile.

(2) If the officer did have a right to search the wallet, was it necessary for him to first give Schraff his *Miranda* warnings before commencing the search?

(3) Under the facts presented did Officer Lewis have any right to seize and search the foil packet which he discovered inside Schraff's wallet?

### III.

#### A. *Was the Seizure and Search of Schraff's Wallet Lawful?*

■ The difficulties and frustrations associated with the analysis of "search and seizure" law often have been noted.[3] Nevertheless, there appears to be a "polar star" which offers some guidance in this field. In *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court stated that warrantless searches are "per se unreasonable" unless they fit within a recognized exception to the warrant requirement. This starting point was reiterated in *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and we are squarely on record as adopting that mode of analysis. *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973).

There is no dispute that Officer Lewis' perusal of appellant's wallet was conducted without a search warrant. Warrantless searches are *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz, supra,* 389 U.S. at 357, 88 S.Ct. at 514. These exceptions have been "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), and the burden falls upon the state to prove that "the exigencies of the situation made the course imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

Thus, assuming Officer Lewis' conduct can be regarded as a search and seizure, the state must establish that such conduct falls within an exception to the warrant requirement.

A question has been raised regarding the quantum of proof which the state must produce to meet its burden of proof. The United States Supreme Court has not addressed this point with regard to searches and seizures. However, in *Lego v. Twomey,* 404 U.S. 477, 487–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the court ruled that the government must prove the voluntariness of confessions by a preponderance of the evidence.[4]

The Ninth Circuit has used the "preponderance" test in cases where the government sought to justify searches and seizures on grounds other than consent. *See United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973); *United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974).

In the present case, the state does not claim that Schraff consented to the search. Indeed, the undisputed facts make it abundantly clear that appellant was in no condition to "freely and voluntarily" consent to anything. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 222–24, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Since the consent exception to the warrant rule is unargued and inappropriate, we conclude that the state must convince us by a preponderance of the evidence that its conduct satisfies some exception to the warrant requirement. With these principles in mind, we proceed to an analysis of the case at bar.

(1) Was there a search of Schraff's wallet?

■ At the outset it must be determined whether Officer Lewis' perusal of Schraff's wallet was a search at all. If it was not, then of course the constitutional claims would abate.

---

3. *See, e. g., Lowe v. Caldwell*, 367 F.Supp. 46, 50–51 (S.D.Ga.1973).

4. For an extensive analysis of the *Lego* decision see *United States v. Watson*, 469 F.2d 362 (5th Cir. 1972).

In *Weltz v. State*, 431 P.2d 502, 505 (Alaska 1967), we reiterated the following definition of a search:

"A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a 'search'."[5] [Footnote omitted.]

Certainly riffling through a person's wallet for contents which are unobservable from outside the wallet fits this definition of a search.

The state offers two theories to preclude it from having to justify Lewis' handling of the wallet under an exception to the warrant rule. Neither theory is persuasive.

■ First, the state urges that, pursuant to AS 28.15.090, the officer had a right to demand Schraff's identification. The statute provides:

"Every licensee shall have his operator's license in his immediate possession at all times *when operating a motor vehicle* and shall display it upon the demand of any uniformed peace officer or authorized representative of the department who identifies himself as such." (emphasis added)

The record is unequivocal in establishing that Schraff was not operating or even near a motor vehicle at the time of the search. At least one court has held that a licensing statute cannot be used for the purpose of finding out who a defendant is, where he has been, or where he is going. In other words, a licensing statute cannot be used as a means for obtaining information or evidence not related to the licensing requirement. *People v. Harr*, 93 Ill.App.2d 146, 235 N.E.2d 1, 2 (1968). Under the facts of this case, the state's reliance on AS 28.15.090 is totally misplaced.

The state also argues that since the wallet was actually taken from Schraff by Jones, a private citizen, the state committed no seizure and hence did not violate Schraff's constitutional rights.[6]

■ It is well established that the Fourth Amendment does not apply to the acts of private individuals who act without government involvement. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). But if a federal agent participates in the search, then the evidence cannot be used in federal court. *Byars v. United States*, 273 U.S. 28, 47 S. Ct. 248, 71 L.Ed. 520 (1927). Likewise, if a state agent participates in the search, no federal prosecution can be brought. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Since Officer Lewis clearly participated in this search, it is certain that no federal case could have been brought under these facts.

---

5. *See also Daygee v. State*, 514 P.2d 1159, 1162 (Alaska 1973).

6. The state does not contend, nor would the facts support an assertion that Jones had the authority to consent for Schraff. In *United States v. Sells*, 496 F.2d 912 (7th Cir. 1974) the court noted:

"In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court said that when the government seeks to justify a warrantless search by showing voluntary consent, it may do so by showing that 'permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effect sought to be inspected.' *Id.* at 993.

Common authority was defined as 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable' for the searching officers to believe that the person giving the consent had the authority to do so. *Id.* at n. 7.

Consent is a factual question and, so too, is the question of the appearance of authority to give it."

The record does not reveal, and common sense does not suggest, that Jones had any mutual use of, or joint access to Schraff's wallet. Hence Jones could not consent for Schraff.

Turning to Alaska's viewpoint on this issue, two cases are germane. In *McGalliard v. State*, 470 P.2d 275, 278–79 (Alaska 1970), we cited with general favor the Ninth Circuit case of *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966). The latter opinion suggests that the courts are concerned with substance and not form in determining whether the government or a private party was truly carrying out the challenged conduct. The *Corngold* decision holds that where a search is conducted solely for the government's benefit, or when the state's officer participates in the conduct, then the conduct cannot be regarded as a strictly private act.

The recent case of *Bell v. State*, 519 P.2d 804, 807 (Alaska 1974), reflects this line of reasoning. In the *Bell* case the officer neither "initiated or participated" in an airport employee's search of the defendant's possessions. Indeed, the police were not even present at the time of the search. Under those facts, and absent any showing of prior communications between the police and the private party, we affirmed the search.[7]

The facts in the present case are not nearly as benign to the state. Not only was Officer Lewis present at the time of the search, but he initiated it by requesting Schraff's wallet, and then participated in it by riffling through the wallet. Obviously Jones' conduct was strictly for the government's benefit. He already had been given his *Miranda* warnings and certainly he did not need or want to determine Schraff's identification.

Finally, the case of *United States v. Issod*, 370 F.Supp. 1110 (E.D.Wis.1974), offers a clear and precise holding for this type of fact pattern. There the court stated:

"The requirements of the Fourth Amendment against unlawful searches and seizures have small significance if

they can be avoided by quietly delegating the physical motions of the search to a private party. A search cannot be viewed as a purely private action if it was encouraged or ordered by government officers. There must be a showing that any involvement of government officers did not influence the actions of a private party. *Coolidge v. New Hampshire,* supra.

.   .   .   .   .   .

The facts presented indicate [the officer] was there not only before the object was accomplished but from the very beginning. The intent was to find out if the parcels contained contraband material. It was [the officer] who actually determined the contents to be marijuana. His direct role in the matter requires that it be viewed as a governmental search." *Issod, supra* at 1113–14.

We conclude that Officer Lewis' proximity and participation in this search refutes any claim that this was a "private search."

(2) Did the wallet search fit within a recognized exception to the warrant rule?

Having established that Officer Lewis' conduct regarding Schraff's wallet constituted a warrantless search and seizure, the burden falls on the state to establish by a preponderance of the evidence that the search fits within a recognized exception to the warrant requirement. The number of these exceptions may vary somewhat depending upon which court performs the analysis,[8] but the following categories can be identified:

(i) A search of abandoned property. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960);

(ii) A search in hot pursuit of a fleeing felon. *Warden v. Hay-*

---

7. For a similar result, *see United States v. Echols*, 477 F.2d 37 (8th Cir. 1973), *cert. denied*, 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973).

8. *Compare Erickson v. State*, 507 P.2d 508, 514–15 (Alaska 1973) (four), *with Wheeler v. Goodman*, 330 F.Supp. 1356, 1361–62 (W.D.N.C.1971) (eight).

*den*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ;

(iii) A search, with probable cause, to avoid destruction of a known seizable item. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ;

(iv) A search of a movable vehicle. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ;

(v) An "inventory" search. *Cooper v. California*, 386 U.S. 58, 87 S. Ct. 788, 17 L.Ed.2d 730 (1967) ;

(vi) A search pursuant to voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct 2041, 36 L.Ed.2d 854 (1973) ;

(viii) A "stop and frisk search. *Terry* "emergency aid". *United States v. Barone*, 330 F.2d 543 (2nd Cir. 1964), *cert. denied* 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964) ;

(viii) A "stop and frisk search". *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ;

(ix) A search incident to an arrest. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

It seems apparent that the search of Schraff's wallet cannot possibly be said to fit within the first six categories above.[9] Indeed, the state's brief does not seek to justify the search as falling within these categories. The case is not as certain with regard to the last three categories.

██ Because of Schraff's stupefied condition at the time of the search, it is possible to argue that Officer Lewis' conduct was designed to provide crucial information in the rendition of emergency aid. The state urges this "emergency" exception in its brief.

The "emergency" exception appears to have originated in modern times with the case of *United States v. Barone*, 330 F.2d 543 (2nd Cir. 1964), *cert. denied*, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964). In that case the police heard screams coming from a building. Upon entering it they found counterfeit money in plain view. The Second Circuit upheld the search stating:

"The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers, and derives from the common law. See generally *Read v. Case,* 4 Conn. 166 (1822)." *Barone, supra,* at 545.

In Alaska we have recognized the "emergency" exception to the warrant rule. In *Stevens v. State*, 443 P.2d 600, 602 (Alaska 1968), *cert. denied* 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969), the police entered a room without a warrant in response to a report by children of a shooting therein. This court upheld the search because the officers' belief in the existence

---

9. A quick review of the first six categories reveals why none of them are applicable.

(a) The wallet simply was not abandoned in fact.

(b) The wallet was not discovered while in hot pursuit of a fleeing criminal.

(c) Officer Lewis was not attempting to prevent the destruction of known contraband. Rather, he was simply attempting to determine Schraff's identification.

(d) This was not a search of a vehicle.

(e) This was not an "inventory" search, as neither Schraff nor Jones were in custody or under arrest at the time. Furthermore, it is not clear that in Alaska the search of a vehicle alleged to be for inventory purposes is justification for failing to secure a search warrant. By raising this exception, we are not intending to pass on that question at this time.

(f) It has already been noted that contending Schraff consented to the search is implausible because of his intoxicated mental state. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed. 2d 854 (1973), the court reiterated that consent must be voluntary and stated that conduct while drugged does not meet that requirement.

of an emergency was reasonable.[10] And, in a non-criminal case we have noted that generally police officers have a customary duty to protect the lives and welfare of the citizens at large. *Lee v. State*, 490 P.2d 1206, 1209–10 (Alaska 1971). However, this duty may not be used as a subterfuge for invading an individual's constitutional rights. In evaluating the facts in this case, we have found it instructive to consider cases from other jurisdictions.

In *United States v. Dunavan*, 485 F.2d 201 (6th Cir. 1973), passersby found appellant in a disabled car, which had set fire to the ground below it. He was foaming at the mouth and unable to talk. They removed him from the car and rummaged through it, seeking to identify him. They found a social security card, two locked briefcases, $961 in cash, a car rental agreement in appellant's name, and keys to a motel room. They then called the police.

The police arrived and because they "thought [appellant] was going to die," went to his hotel room for identification to give to the hospital. At the hotel they found a key to the suitcases, which they then opened revealing the "loot" from a bank robbery. Appellant was convicted of robbery and appealed, challenging the search.

The Sixth Circuit upheld the conviction stating:

" . . . [W]e deem . . . the critical problem to be whether the officers who opened the . . . briefcase taken from [appellant's] car did so, as they asserted, as a matter of rendering emergency aid to a person in a seizure, or whether this explanation of their search was a pretext." *Dunavan, supra* at 203.

The court went on to add that the government had the burden of showing the objective reasonableness of the officers' conduct.

In *Vauss v. United States*, 125 U.S.App. D.C. 228, 370 F.2d 250 (1966), the court, in a per curiam opinion, affirmed appellant's conviction for violating narcotics laws. There, the appellant was found unconscious on the street by the police. When

10. An extended analysis of the emergency exception was offered by Chief Justice Warren Burger, when he was sitting as an appellate judge on the D.C. Circuit. In *Wayne v. United States*, 115 U.S.App.D.C. 234, 318 F.2d 205 (1963), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), police uncovered a criminal abortion when they forcefully entered an apartment in which they thought there was an unconscious woman. *See also Pope v. State*, 478 P.2d 801, 805 (Alaska 1970).

Judge Burger wrote:

"[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' . . ., e. g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

. . . That such an entry would be an intrusion is undoubted but here we reach the balancing of interests and needs. When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act [without a warrant] on that information, even if ultimately found erroneous." *Wayne v. United State, supra* at 212.

The entire "emergency doctrine" is reviewed by Mascolo in *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buffalo L.Rev. 419 (1973).

they could not rouse him, they called an ambulance, and then searched him for identification in order to prepare a hospital report. The search revealed cellophane bags of white powder which proved to be narcotics.

The opinion states:

"A search of one found in an unconscious condition is both legally permissible and highly necessary. There is a positive need to see if the person is carrying some indication of medical history, the rapid discovery of which may save his life; there is also a need to identify persons so found in order to notify relatives or friends." *Vauss, supra* at 252.

In *People v. Gonzales*, 182 Cal.App.2d 276, 5 Cal.Rptr. 920 (1960), the police found the defendant suffering from severe knife wounds and "in shock." They searched him for identification and found marijuana. The California appeals court affirmed his conviction stating:

"Reasonableness is not a mere matter of abstract theory but a practical question to be determined in each case in the light of its own circumstances." *Gonzales, supra* at 923.

In *People v. Smith*, 47 Ill.2d 161, 265 N. E.2d 139 (1970), the police responded to a radio call concerning a man who was "down" in a hallway. On arrival they found the defendant disoriented and incoherent, but there was no alcohol on his breath. When he failed to answer questions regarding his identification, they searched him for identification and found marijuana in his back pocket. The Illinois Supreme Court affirmed the conviction stating:

" . . . [T]he preservation of human life is paramount to the right to privacy protected by the search and seizure laws and constitutional guarantees . . ." *Smith, supra* at 147.

In *State v. Agent*, 101 N.J.Super. 190, 243 A.2d 846 (1968), the defendant, who was unconscious, was brought to the police station by two unidentified men. The police searched the defendant for identification and information regarding next of kin. The New Jersey appeals court affirmed the search but noted that prior to the search nothing indicated that the defendant had broken any laws and he was "obviously sick or injured."

In *State v. Miller*, 486 S.W.2d 435 (Mo. 1972), the police went on call to check a "downed" man in a restroom. A pat search of the unconscious man revealed a bag full of pills and syringes. When the defendant regained consciousness the police asked if he had any medical problems. When the defendant said he did not, the police arrested him. His conviction was upheld.

Finally, in *State v. Jordan*, 79 Wash.2d 480, 487 P.2d 617 (1971), a maid at a hotel became concerned about a guest who had not moved from his bed for many hours. She called the police. They found the man unconscious and called an ambulance. The police then noted that the man had "needle tracks" on his arm. Upon searching him for identification, drugs were found. The search was affirmed as being reasonable under the circumstances.

With this background of cases and legal principles in mind, we can now examine the present case to determine whether the search of Schraff's wallet should be upheld.

Officer Lewis came to the 49'er Club in response to a call from Trooper Ahlfors. Officer Lewis was a narcotics agent. He came to help Ahlfors in an investigation Ahlfors was conducting pertaining to marijuana the trooper allegedly had found in a vehicle.

Hence, it is fair to say that Lewis came to the club to conduct an investigation relating to narcotics. He wanted to know Schraff's identification in part because, as he put it, Schraff was a "possible defendant in a possible criminal act." Officer

Lewis admitted that this was how the narcotics squad gained information about drug users.

When he arrived at the bar he found Schraff in a very debilitated state. The appellant was "sitting on the floor holding his stomach", making unintelligible sounds. Officer Lewis was advised that Schraff and Jones had run their vehicle into a ditch and had come into the bar to "sleep it off." Schraff lacked coordination, his eyes were glazed and blood shot, and he was unable to speak. Schraff had no smell of alcohol on him and there were no alcoholic beverages near him.

At that time Officer Lewis asked Schraff for his identification. When asked in court why he wanted the identification, Officer Lewis stated:

> "Because of the fact that either Mr. Jones or Mr. Schraff may have been a possible defendant in a criminal act. Mr. Schraff was in such a condition that normally when we find a person that's under the influence in this state, and we don't know if he's subsequently going to need medical attention or would be a problem later on or anything like this, and it's routine procedure to identify them."

When the facts in the case before us are compared with the "emergency" cases cited above, several distinctions are readily apparent. First, Officer Lewis came to the scene for the purpose of conducting a narcotics investigation. In the other cases, the officers seemingly had emergency aid as their only objective in going to the scene at all. Second, Schraff was not totally unconscious and he was accompanied by a companion who was somewhat responsive. In the other cases, the police had no other way of getting necessary information about the defendant without conducting a search. Finally, Officer Lewis admitted that several motives, in-

cluding crime detection, prompted his search of Schraff's wallet. In the other cases, the officers claimed that their only motivation was that of rendering aid to an injured person. In view of these distinctions, we conclude that Officer Lewis' conduct did not fall within the "emergency" exception to the warrant rule.

Since the state also places some reliance on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in seeking to justify its conduct, a consideration of the "stop and frisk"[11] exception to the warrant rule is necessary. Here again, however, the facts do not support the state's claim.

The cases are legion in holding that suspicion must exist in order to stop a person in the first place, and the officer must reasonably believe that the person is armed and dangerous before any frisk is permissible. *See Terry v. Ohio, supra; United States v. Davis,* 482 F.2d 893, 906 (9th Cir. 1973); *United States v. Davis,* 441 F.2d 28 (9th Cir. 1971); *United States v. Wilson,* 465 F.2d 1290 (7th Cir. 1972); *United States v. Foust,* 461 F.2d 328 (7th Cir. 1972); *United States v. Garcia,* 358 F. Supp. 1042, 1046 (D.C.Tex.1973).

Thus, assuming Officer Lewis had a right to stop and question the appellant, it does not follow that he had the right to frisk him, or to take his personal property. *United States v. Coates,* 161 U.S.App.D.C. 334, 495 F.2d 160, 165 (1964). The Supreme Court noted in *Terry* that even a cursory search is "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." *Terry, supra,* 392 U.S. at 17, 88 S.Ct. at 1877.

■ Officer Lewis testified that he did not think Jones was armed and he did not find a need to frisk Schraff. Under these circumstances, and in view of the vast

---

11. For an exhaustive, though perhaps dated, analysis of "stop and frisk" law *see* LaFave, *"Street Encounters" and the Constitution:* *Terry, Sibron, Peters and Beyond,* 67 Mich. L.Rev. 39 (1968).

quantity of case law requiring apprehension of weapons before a frisk can be justified, the state has not established the "stop and frisk" exception to the warrant rule.[12]

▮ Finally, the state strenuously urges that the search is justified under the "search incident to arrest" doctrine. It contends that the information concerning the marijuana in the car, coupled with the debilitated state of the defendant, gave Officer Lewis probable cause to arrest the defendant and to search him incident thereto.

Our decision in *Peter v. State*, 531 P.2d 1263 (Alaska 1975), establishes narrow boundaries for searches incident to custodial detainment for drunkenness. Schraff's debilitated condition had not resulted in any complaints of conduct of a criminal nature, and Officer Lewis testified that he felt no need to search Schraff for weapons. Therefore, Schraff's stuporous state offers no justification whatever for the search which took place.

We turn next to Trooper Ahlfors' apparent discovery of marijuana in the vehicle. If the discovery was in the course of a lawful search, the evidence so obtained may have given rise to probable cause to arrest and a search incident thereto. However, the evidentiary development of the circumstances and details surrounding this event is inadequate to enable us to make a reasoned determination regarding the propriety of his actions at the automobile.

Trooper Ahlfors' search of the car was described by Officer Lewis at the trial:

> Lewis: . . . [Ahlfors] advised me at that time that he had been making a routine bar check in the 49er Club and had observed 2 individuals who appeared to be passed out and unconscious on the floor of the club. And

when he inquired of the bartender as to what they were doing there, the bartender advised that they had gotten their vehicle stuck in a ditch and that the owner had seen it and had seen to it that the subjects were removed and placed inside the bar where they could sleep it off. And Trooper Ahlfors said that he had told the bartender that that was fine and asked him not to allow them to drive the vehicle until such time as they were sober. And then he asked which vehicle it was that they were driving, and the bartender described the vehicle. Trooper Ahlfors went out to check it out to make sure it was secured, and observed the window was open and the keys in the ignition. He advised me that as he reached in to remove the keys from the ignition, that he observed what appeared to be marijuana on the floorboards, and that . . .

Counsel: And then he called you?

Lewis: That's correct.

Officer Lewis testified that Trooper Ahlfors contacted him only after he discovered a bag containing 20 ounces of marijuana *in the back seat of the vehicle*. In any event, it is uncontested that Ahlfors told Lewis that he had discovered marijuana in the vehicle in which Schraff allegedly had been riding.

We do not disapprove of Trooper Ahlfors' efforts to secure the vehicle. Indeed, the officer may have had a duty to do that very thing. *Lee v. State*, 490 P.2d 1206, 1209–10 (Alaska 1971).

But certain questions have not been adequately explored. For example, the state has not explained how in the middle of the night, in winter, Trooper Ahlfors, who was ostensibly looking for car keys, was able to recognize and identify an alleged quantity of marijuana on the floorboard of an unat-

---

12. Some courts have given unrestrained support to so-called "field interrogations." *See, e. g., Loyd v. Douglas*, 313 F.Supp. 1364 (D.C.Iowa 1970). But at least one court has held that merely because a " 'common police procedure' in dealing with strangers" is involved it does not justify intrusions into pockets and suitcases, even if a "stop and frisk" was in order. *United States v. Hostetter*, 295 F.Supp. 1312 (D.C.Del.1969).

tended automobile. Nor do we know what prompted Trooper Ahlfors to probe into the back seat of the automobile. Even if these searches were justifiable,[13] the information which would justify associating Schraff with the car is unclear.

The facts available to us suggest that a possibly unlawful vehicular search may have provided whatever probable cause for arrest Officer Lewis had at the time he seized Schraff's wallet. Therefore, under the "tainted evidence" doctrine announced in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the arrest and search incident thereto might be invalid. Because of the crucial nature of this issue, we remand the case to the superior court for a full hearing on the propriety of the vehicular inspection conducted by Trooper Ahlfors.

If the court on remand finds that the marijuana was not "tainted evidence" and that further it can serve as probable cause for the subsequent arrest one other matter still requires treatment here. This concerns the right of the police to search a person before effecting an arrest, if probable cause to arrest that person exists prior to the search. We have held that a search incident to arrest may precede the arrest, *Goss v. State*, 390 P.2d 220, 223–224 (Alaska 1964), but have required a substantial contemporaneity of search and arrest.[14] In *Goss*, we found a search which preceded an arrest to be lawful where the search occurred after probable cause for the arrest had arisen, and the arrest followed almost immediately thereafter.

■ It goes without saying, of course, that such a search must be incident to the arrest. *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Additionally, an arrest may not be justified by what the subsequent search discloses. *Rios v. United States*, 364 U.S. 253, 261–62, 80 S.Ct. 1431, 4 L.Ed.2d 1688

(1960); *Taglavore v. United States*, 291 F.2d 262, 267 n. 3 (9 Cir. 1961). Finally, the arrest may not be used as a mere pretext to search. *Henderson v. United States*, 12 F.2d 528, 529 (4th Cir. 1926); *United States v. Lassoff*, 147 F.Supp. 944, 953 (E.D.Ky.1957).

Therefore, if the trial court determines on remand that the circumstances surrounding the discovery of marijuana in the automobile provided probable cause for the arrest of Schraff, the search of the wallet may be considered a search incident to arrest. The trial court should also determine whether the search and arrest were substantially contemporaneous.

We now turn briefly to the remaining issues presented on this appeal.

### B. Did Lewis Need to Give Schraff the "Miranda" Warning Before He was Entitled to Search His Wallet?

■ Schraff contends that he was entitled to *Miranda* warnings before a search of his wallet lawfully could be conducted. Appellant's claim of error is without merit.

The *Miranda* opinion was concerned with Fifth and Sixth Amendment rights in the context of "custodial" interrogations. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Assuming arguendo that Lewis' demand for Schraff's identification was made in a "custodial" context, no interrogation of Schraff was made at the 49'er Club. Thus, *Miranda* warnings would seem to be wholly unnecessary.

■ Even if we focus on the constitutional proscription against unreasonable searches and seizures, the asserted need for *Miranda* warnings is unpersuasive. It is well established that "testimonial" or "communicative" evidence may be seized during an otherwise lawful search and seizure. *See United States v. Murray*, 492 F.2d 178, 191 (9th Cir. 1973) (address

---

13. Officer Lewis admitted that the car search may have been unlawful.

14. In *Layland v. State*, 535 P.2d 1043 (Alaska 1975), an arrest occurring over three months after the search was held not to be substantially contemporaneous.

book); *United States v. Bennett*, 409 F.2d 888, 896 (2nd Cir. 1969) (letter). This lays to rest any Fifth Amendment claims which appellant might assert regarding the search of his wallet. Thus the only theory on which the *Miranda* warning might logically be asserted rests with the claim that it is necessary for an effective "consent to search." [15] However, the state has not asserted that the search was justified on a consent theory, and in view of Schraff's debilitated condition, such an assertion would be difficult to sustain. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We conclude that appellant's claim in this regard is wholly lacking in merit.

### C. Did Officer Lewis Have the Right to Seize and Open the Foil Packet Found In Schraff's Wallet?

Since Officer Lewis may have had a right to examine Schraff's wallet, and since he was not required to give any constitutional warnings as a prerequisite to that right, we must decide whether Lewis had the right to seize and search the foil packet which he found in Schraff's wallet.

We believe that if Officer Lewis had a right to search through the wallet in the first place, he had the right to seize the evidence which he observed from a lawful position of intrusion. If the intrusion into the privacy of Schraff's wallet can be justified, particularly regarding the point at which the foil packet came into view, the seizure of the packet would be lawful under the "plain view" doctrine. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91

S.Ct. 2022, 29 L.Ed.2d 564 (1971).[16] *See also, Bell v. State*, 519 P.2d 804, 808–809 (Alaska 1974).

We also must consider Officer Lewis' opening, i. e. "search", of the foil packet. We previously have given substantial weight to a law enforcement officer's expertise in identifying contraband substances. *Cf. Bell v. State*, 519 P.2d 804, 808 (Alaska 1974); *Daygee v. State*, 514 P.2d 1159, 1163 (Alaska 1973).[17]

In the present case, Officer Lewis, a trained narcotics investigator, testified that the foil packet was identical to so-called "slips" which are used to carry a variety of illicit drugs. He was certain that the packet was a "slip", and he had never seen a "slip" that was not used for carrying narcotics and dangerous drugs. He therefore concluded that the foil packet undoubtedly contained illicit drugs.

In addition, the packet was not firmly within police custody at the time that it was seized.[18] Instead, it was on the person of a man who was in a public bar, accompanied by a relatively coherent friend, who seemingly had access to an automobile. Thus, the exigency of the situation, when coupled with Officer Lewis' experience and unequivocal testimony regarding his recognition of the contraband nature of the foil packet, convinces us that both the search and seizure of the packet were lawful, provided that, on remand, the state can establish that the intrusion into Schraff's wallet was conducted as a search incident to a lawful arrest.

Remanded for proceedings in accordance with the opinion herein.

---

15. For an analysis of the question *see* Note, *Consent Searches: A Reappraisal After Miranda v. Arizona*, 67 Colum.L.Rev. 130 (1967). In *Sleziak v. State*, 454 P.2d 252 (Alaska 1969), we left open for future decision the question of whether a *Miranda* warning is a prerequisite to a valid consent to search.

16. *Compare:* In *State v. Spietz*, 531 P.2d 521 (Alaska 1975), we affirmed the suppression of evidence seized when officers, standing

*outside* a house, noticed marijuana inside. Since there had been no lawful intrusion into the house at the outset, the plain view doctrine could not justify the seizure of the contraband.

17. *See also United States v. Wheeler*, 148 U.S.App.D.C. 204, 459 F.2d 1228 (1972).

18. *Compare Erickson v. State*, 507 P.2d 508, 516 (Alaska 1973). *See also McCoy v. State*, 491 P.2d 127, 141 (Alaska 1971) (Rabinowitz, J. and Connor, J. dissenting in part).

ERWIN, J., did not participate.

BOOCHEVER, Justice, with whom RABINOWITZ, Chief Justice, joins, concurring.

While I agree that the facts of the instant case do not bring the contested wallet search within the strict limits of the emergency doctrine,[1] I disagree with the reasoning of the majority in its treatment of this exception to the fourth amendment's warrant requirement. The majority finds that the emergency doctrine is inapplicable in the instant case because (1) Officer Lewis' purpose in coming to the scene was to conduct a drug investigation; (2) several motives, including crime detection, prompted the wallet search and (3) Schraff was not totally unconscious and was with a somewhat responsive companion.

Had the state established that Officer Lewis, upon observing Schraff at the 49er Club, reasonably believed that it was necessary to identify him for immediate medical treatment, a search under the emergency doctrine should not be precluded because Lewis had gone to the club to conduct a drug investigation. To disallow the emergency exception in such a circumstance might well prevent a police officer from fulfilling his customary duty of protecting the lives and welfare of citizens at large. *Lee v. State*, 490 P.2d 1206, 1209–10 (Alaska 1971).

A police officer's initial purpose is not necessarily controlling if a valid independent ground for a search or arrest becomes apparent to the officer on first contact with a suspicious person, vehicle or premises. *Williams v. United States*, 273 F.2d 781, 794 (9th Cir. 1959); *Donahue v. United States*, 56 F.2d 94, 97 (9th Cir. 1932). Even in cases where the officer's initial purpose was held to be invalid, searches have been upheld where there is a subsequently valid independent basis. *United States v. Bugarin-Casas*, 484 F.2d 853 (9th Cir. 1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1973); *Green v. United States*, 386 F.2d 953, 956 (10th Cir. 1967). Similarly, the emergency doctrine could provide a valid independent ground for a search regardless of a police officer's original purpose.

Finally, it seems to narrow a reading of the emergency exception to require that a person be alone and unconscious before he can be searched for identification in a medical emergency. In the instant case, Schraff, though conscious, was totally unable to communicate; his companion, though "somewhat responsive", appeared to Officer Lewis to be heavily drugged or intoxicated, and Lewis could reasonably have concluded that Jones was not a reliable source for identifying Schraff.

The test I would use in applying the emergency exception in the instant case and in other situations is whether a reasonable police officer, acting under the totality of the circumstances as they appeared to him at the time, would believe that a medical emergency existed (an imminent and substantial threat to life or health) and that a search of the sick or injured person for immediate identification was necessary. I would disallow the exception in the instant case solely for the reason that Officer Lewis' conduct at the 49er Club and his testimony at trial do not reveal the immediacy and urgency in identifying Schraff for medical treatment which the courts have held to be essential to trigger the emergency doctrine.

RABINOWITZ, Chief Justice (concurring in part, dissenting in part).

I am in agreement with the court's resolution of all issues raised in this appeal with the exception of the intensity of the

---

1. The emergency doctrine is based on a showing of a true necessity—that is, an imminent and substantial threat to life, health or property. *People v. Smith*, 7 Cal.3d 282, 101 Cal.Rptr. 893, 496 P.2d 1261, 1263 (1972); *see also Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409, 414 (1970); *United States v. Jeffers*, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951).

search issue. More particularly, I am of the view that, even assuming Officer Lewis had the right to examine Schraff's wallet, the officer's opening of the folded aluminum foil packet constituted an unreasonable search under Article I, Section 14 of the Alaska Constitution.

The precise issue of the permissible intensity of warrantless searches incident to arrest was previously before this court in *McCoy v. State*, 491 P.2d 127 (Alaska 1971). There McCoy contended that once a foil packet had been removed from his person, the police officer was not endangered by any weapons that might have been concealed in the foil packet and any evidence therein was safe from destruction. In these circumstances McCoy asserted that in order to look inside the packet, the officer should have first obtained a search warrant. After accurately stating that "[t]his argument raises the most troublesome questions presented in this appeal, and has provoked considerable disagreement among the members of this Court,"[1] the majority in *McCoy* held that the warrantless search of McCoy's packet was sustainable as coming within the exception to the warrant requirement for searches of the person incident to a lawful arrest.

I deem this an appropriate occasion to briefly reiterate the views I expressed in my dissenting opinion in *McCoy*. There I stressed Justice Frankfurter's analysis of rationales underlying the exception which permits search of the person of the arrestee incident to an arrest. In Justice Frankfurter's view this exception was recognized:

> [F]irst, in order to protect the arresting officer and to deprive the prisoner of potential means of escape * * * and, secondly, to avoid destruction of evidence by the arrested person. * * * From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control.[2]

In my dissent in *McCoy*, I expressed the opinion that these rationales provide the theoretical and practical justification for departure from the constitutional requirement that searches be conducted pursuant to warrants. Further, I stated that these same justifications provide relevant criteria for delineation of the permissible degree of intensity of a warrantless search of the person incident to a lawful arrest. Applying these thoughts, I concluded in *McCoy* that

> . . . once the possibility of the arrestee's escape is prevented, the officer's safety insured, and the danger of concealment and destruction of evidence of the crime for which the arrest is made eliminated, then there no longer exists any necessity, or exigency, justifying continuation of the warrantless search of the person of the arrestee. . . . In order to lawfully search the interior of the small packet and seize its contents, once the dangers of concealment or destruction were no longer relevant considerations, it was incumbent upon the police to persuade a neutral and detached judge to issue a search warrant authorizing the search of the packet for evidence of the crime of forgery.[3] (footnote omitted)

Following my *McCoy* analysis, I am led to the conclusion that once Officer Lewis gained control and possession of Schraff's wallet and the aluminum foil packet, the danger of destruction, or concealment of its contents dropped out of the case.[4]

1. 491 P.2d at 131.

2. *United States v. Rabinowitz*, 339 U.S. 56, 72, 70 S.Ct. 430, 437, 94 L.Ed. 653, 663–64 (1950) (citations omitted).

3. 491 P.2d at 141.

4. I cannot accept the majority's statement that ". . . the packet was not firmly within police custody at the time that it was seized." In the case at bar there were apparently two police officers in the tavern attempting to cope with one fairly coherent but passive individual (Jones) and the completely inebriated and incapacitated appellant. The record is devoid of any indication that either Jones or Schraff represented any sort

Thus, no exigency or necessity remained to justify Officer Lewis' opening of the packet without first having obtained a search warrant.[5]

Mention should also be made of the majority's treatment of the "plain view" doctrine and the expertise of the officer who conducted the search. In *Erickson v. State*, 507 P.2d 508, 514–15 (Alaska 1973) (footnotes omitted), we said " . . . this court has repeatedly cautioned that a search without a warrant is per se unreasonable unless it clearly falls within one of the narrowly defined exceptions to the warrant requirement. . . . '[A]ny new exception to the warrant requirement, no matter how reasonable in terms of its purpose, is viewed with caution.' "[6] Of importance to the case at bar is the discussion of plain view found in *Erickson*. In holding that the contents of a locked suitcase were not in plain view, we alluded to Justice Traynor's statement that

[i]t is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made

of. A search of the container is necessary to disclose its contents.[7]

Of particular significance here is the rejection in *Erickson* of "constructive" plain view which is seemingly employed by the majority in the instant case by virtue of its reliance upon Lewis' drug expertise as justification for both the seizure and the search of the packet. Again looking to Justice Traynor in *Erickson*, this court quoted with approval the following passage from his opinion in *People v. Marshall*, 69 Cal.2d 51, 69 Cal.Rptr. 585, 588, 442 P.2d 665, 668 (Cal.1968). There Justice Traynor wrote:

This contention overlooks the difference between probable cause to believe contraband will be found, which justifies the issuance of a search warrant, and observation of contraband in plain sight, which justifies seizure without a warrant. However strongly convinced officers may be that a search will reveal contraband, their belief, whether based on the sense of smell or other source, does not justify a search without a warrant.[8]

---

of physical threat to the officers present in the tavern.

In my view, the packet in the instant case was not any less fully secured by the police than was the evidence in *State v. Spietz*, 531 P.2d 521 (Alaska 1975), and *Daygee v. State*, 514 P.2d 1159 (Alaska 1973).

5. In 1975 a majority of the Supreme Court of California essentially endorsed the position taken by the *McCoy* dissent. *See People v. Longwill*, 14 Cal.3d 943, 123 Cal.Rptr. 297, 538 P.2d 753 (1975); *People v. Norman*, 14 Cal.3d 929, 123 Cal.Rptr. 109, 538 P.2d 237 (1975); *People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099, 1105–10 (1975).

6. In support of the text the following decisions of this court were cited: *McCoy v. State*, 491 P.2d 127, 132 (Alaska 1971); *Bargas v. State*, 489 P.2d 130, 132 (Alaska 1971); *Ferguson v. State*, 488 P.2d 1032, 1035–37 (Alaska 1971); *Rubey v. City of Fairbanks*, 456 P.2d 470, 474 (Alaska 1969); *Sleziak v. State*, 454 P.2d 252, 256 (Alaska),

*cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 702 (1969); *Weltz v. State*, 431 P.2d 502, 505–07 (Alaska 1967); *Ellison v. State*, 383 P.2d 716, 719 (Alaska 1963).

7. 507 P.2d at 513, quoting *People v. Marshall*, 69 Cal.2d 521, 69 Cal.Rptr. 585, 589, 442 P.2d 665, 669 (1968).

8. In *State v. Spietz*, 531 P.2d 521, 523 (Alaska 1975), the police, in effecting an arrest, saw through an open door on the porch of defendant's home marijuana inside the home. In affirming the superior court's suppression order, we said that plain view alone is never enough to justify the warrantless seizure of evidence. In *Spietz* this court identified the requirements for invocation of the plain view doctrine as follows: the prior intrusion has to be legally justifiable; the plain view discovery must be inadvertent; and there must be exigent circumstances which justify the seizure of the plain view evidence at the moment rather than later, pursuant to a warrant.

On the basis of the foregoing, I further conclude that Officer Lewis' expertise cannot furnish legal justification for the warrantless search which was carried out here. Nor can the search of the packet be sustained under this court's prior plain view decisions.[9]

**9.** Since two of our colleagues are not participating in this appeal, I leave for a more appropriate occasion discussion of *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973), and *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). As of this date this court has not decided whether to follow the Supreme Court's approval of extensive warrantless searches of the person of the arrestee. In these cases the only restrictions the Supreme Court drew was that the police may not engage in patently abusive conduct which shocks the conscience and offends Due Process.